IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAWN M. CLARY, | |
| Plaintiff, | 4:22CV3230 |
| vs. | |
| TRISTAR PRODUCTS, INC., | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on Defendant Tristar Products, Inc.'s Motion for Summary Judgment. (Filing No. 75) and Motion to Exclude the Opinions of Dr. John Pratt (Filing No. 78). For the reasons stated below, both motions are denied.

STATEMENT OF FACTS

On July 17, 2020, Plaintiff Dawn M. Clary was using a Power Quick Pot model Y6D-36 pressure cooker (the "pressure cooker"), marketed and distributed by Defendant Tristar Products, Inc. ("Tristar"). (Filing No. 1; Filing No. 80-4 at 9.) When the pressure cooker finished cooking, Ms. Clary alleges she opened the pressure cooker's steam release valve two times. (Filing No. 80-4 at 10.) After steam had stopped exiting the valve, Ms. Clary allegedly grabbed the lid to open the pot and rotated the lid to the open position. (Filing No. 80-4 at 10.) The lid then blew off, and the contents of the pressure cooker exploded onto her, burning her face, chest, and arms. (Filing No. 80-4 at 10-11.) Ms. Clary has brought this action against Tristar for her injuries from the explosion, alleging defective design, negligence, breach of express warranty, breach of implied warranty of merchantability, and failure to warn. (Filing No. 1.)

On May 28, 2025, Tristar filed its Motion for Summary Judgment on the basis that (1) it has a right to arbitration, (2) the testimony of Dr. John Pratt, Ms. Clary's expert witness, is

inadmissible, and (3) Ms. Clary admitted the pressure cooker was depressurized at the time of her injury. (Filing No. 75; Filing No. 77.) Tristar additionally filed a *Daubert* Motion to Exclude the Opinions of Dr. John Pratt on the same date, arguing the expert testimony is inadmissible and should be excluded. (Filing No. 78.)

1.  **Pressure Cooker Arbitration Agreement**

This case commenced on October 18, 2022, when Ms. Clary filed her complaint with this Court. (Filing No. 1.) Since then, both parties have engaged in the discovery process throughout the litigation of this case. The Magistrate Judge issued a Final Progression Order on July 11, 2023, which set January 24, 2024 as the written discovery deadline and required depositions to be completed by April 28, 2024. (Filing No. 31.) While this order was amended twice to extend the discovery deadline (Filing No. 49; Filing No. 57), Tristar served its first set of written discovery on Ms. Clary on October 13, 2023 (Filing No. 36.) and noticed the deposition of Ms. Clary on April 24, 2024, with a deposition scheduled on May 16, 2024. (Filing No. 50.) Tristar ultimately deposed Ms. Clary for the first time on September 10, 2024, and again on April 15, 2025. (Filing No. 80-4; Filing No. 80-14.) Additionally, Tristar has responded to written discovery (Filing No. 36; Filing No. 47), stipulated to a protective order (Filing No. 44), identified expert witnesses (Filing No. 62), deposed Plaintiff's expert witness (Filing No. 80-9), and filed several motions (Filing No. 44; Filing No. 48; Filing No. 53; Filing No. 65).

In Tristar's answer to the complaint filed on January 20, 2023, Tristar asserted as an affirmative defense, "Under applicable choice-of-law principles the law of the state of injury may apply to this dispute, and this dispute may therefore be subject to the exclusive jurisdiction of the American Arbitration Association pursuant to the terms and conditions of Plaintiff's purchase." (Filing No. 18 at 11.) The record indicates an arbitration agreement is included with the owner's manual for the pressure cooker ("Tristar Arbitration Agreement"). (Filing No. 80-4 at 21-22). The Tristar Arbitration Agreement states the following:

> **ARBITRATION AGREEMENT.** BY PURCHASING A TRISTAR PRODUCT, YOU AGREE THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ANY DISPUTE WITH TRISTAR CONCERNING THE PRODUCT SHALL BE RESOLVED BY BINDING INDIVIDUAL ARBITRATION. TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOUR ARBITRATION CANNOT BE JOINED WITH ANOTHER ARBITRATION, WHETHER THROUGH CLASS

ACTION ARBITRATION PROCEEDINGS OR OTHERWISE. YOU HAVE THE RIGHT TO OPT OUT OF ARBITRATION AND TO PRESERVE YOUR RIGHT TO SUE AND TO PARTICIPATE IN A CLASS ACTION. THE OPT OUT PROCEDURE IS DISCUSSED IN THE "OPT OUT PROCEDURE" SECTION BELOW.

. . .

**OPT OUT PROCEDURE.** You have thirty (30) days from the date of product delivery to opt out of arbitration. To opt out of arbitration you must contact us and request to opt out of arbitration. If more than thirty (30) days have passed, you are not eligible to opt out of arbitration and you will have waived your right to sue and your right to participate in a class action.

(Filing No. 80-15.)

At her deposition on September 10, 2024, Ms. Clary testified that the pressure cooker came with a bag of paperwork that looked similar to the one she was shown at her deposition, which included the Tristar Arbitration Agreement. (Filing No. 80-4 at 21-22.) She later testified that she was unsure whether she had seen the Tristar Arbitration Agreement before her deposition or if the agreement was in the paperwork she received with the pressure cooker. (Filing No. 80-4 at 49.) Regardless, Ms. Clary did not contact Tristar to opt out of the Tristar Arbitration Agreement or any arbitration agreement. (Filing No. 80-4 at 20-21).

Ms. Clary also testified that her boyfriend, David Shaffer, had purchased the pressure cooker. (Filing No. 80-4 at 7.) Mr. Shaffer testified that he was "very confident" that he purchased the pressure cooker. (Filing No. 96-3 at 27.) However, the complaint provides that Ms. Clary purchased the pressure cooker from Walmart in Bellevue, Nebraska in April or May 2020. (Filing No. 1 at 4.) Ms. Clary has not amended the complaint to reflect that Mr. Shaffer purchased the pressure cooker, and the deadline to do so passed on November 26, 2024. (Filing No. 57.)

2.   **Dr. Pratt's Proffered Testimony**

Ms. Clary asserts that a product defect in the locking mechanisms enabled her to open the pressure cooker while it was still pressurized, causing the explosion and resulting injuries. (Filing No. 1.) The Y6D-36 model has two locking mechanisms to ensure it remains locked while pressurized. The model has a manual lock that activates when the pressure cooker's lid is rotated into the closed position (the "manual lock"). (Filing No. 80-1 at 4.) The manual lock remains

3

engaged until the steam release valve is opened via an open/close switch on the lid. (Filing No. 91-2 at 12.) The model also has a pressure activated lock that activates when the unit builds steam pressure sufficient to cause the float valve to extend and seal shut, which restricts the strike plate "from moving freely in and out[,]"thereby preventing the lid from being rotated or removed (the "pressure lock"). (Filing No. 80-1 at 4; Filing 91-2 at 11.) The pressure lock remains engaged until sufficient steam exits the Y6D-36 unit, releasing enough pressure for the float valve to retract and disengage the lock. (*See* Filing No. 91-2 at 10-12.)

Ms. Clary retained Dr. Pratt as an expert witness in this action. (Filing No. 91 at 1.) Dr. Pratt inspected and tested Ms. Clary's pressure cooker for potential defects to determine whether "the subject pressure cooker could be opened easily under pressure sufficient to cause injury." (Filing No. 91 at 1.) Based on these tests, Dr. Pratt derived his opinion on whether the pressure cooker had defects that could have caused Ms. Clary's injuries while using the pressure cooker in a foreseeable manner. (Filing No. 91-2 at 3.)

Dr. Pratt has a Ph.D. in Civil Engineering, holds over 55 years in experience in developing "permanent and temporary fasteners, mechanisms, and related tooling and equipment, for the aerospace, industrial and sporting goods markets[,]" and has tested over 150 pressure cookers in other litigation and over 50 pressure cookers for purposes unrelated to litigation to determine whether they could be opened under pressure. (Filing No. 91-2 at 3, Filing No. 91 at 2.)

Dr. Pratt uses the "Forensic Engineering Method" in his testing, which Dr. Pratt admits is not the same as "the 'classical' scientific method." (Filing No. 91 at 6.) The scientific method "involves the methodological formulation of hypotheses and collection of data to test the hypotheses specifically via experimentation" and is "traditionally applied to new science." (Filing No. 91-3 at 2.) Unlike the classical scientific method, however, forensic engineering involves "the establishment of factors of causation or prevention" of an incident that has already occurred, so the "formation of hypotheses is most often not required." (Filing No. 91-3 at 2.) The Forensic Engineering Method instead utilizes the application of established science in conjunction with the practitioner's "knowledge, education, experience, training and skill" to seek solutions to forensic problems. (Filing No. 91-3 at 2.) This method does not necessarily seek to recreate past events. (Filing No. 91-3.) Rather, the method uses tests to determine whether alleged events could occur under the conditions alleged. (Filing No. 91 at 6.)

4

In this litigation, using the Forensic Engineering Method, Dr. Pratt conducted a visual inspection of the pressure cooker and then two tests: the Lid Removal Under Pressure Test and the Lid Safety Locking Mechanism Test. (Filing No. 91 at 3).

*Visual Inspection*

Prior to testing, Dr. Pratt visually inspected the pressure cooker. (Filing No. 91 at 2.) In his visual inspection, Dr. Pratt identified defects in the pressure cooker's float valve "based on the visually nearly non-existent interference between the strike plate opening and float valve stem[.]" (Filing No. 91 at 2.) Dr. Pratt also identified "clogging of the exhaust pipe by virtue of the large amount of debris at its entrance." (Filing No. 91 at 2.) Dr. Pratt opined the minimal interference between the pressure cooker's strike plate and float valve was like other "similarly constructed Tristar [pressure] cookers that were easily opened under pressure," and unlike pressure cookers that were not easily opened or defeated under pressure. (Filing No. 91 at 2-3.)

*Lid Removal Under Pressure Test*

The Lid Removal Under Pressure Test tests whether "the safety mechanisms in the subject pressure cooker prevent the lid from opening while under pressure." (Filing No. 91 at 4.) To perform the test, the cooking pot is filled with hot tap water to the "max fill line," the lid is attached, the pressure cooker is set to "pressure/beef/high" mode with the default cooking time. (Filing No. 91-2 at 56.) Approximately one minute after the floating valve extends, the pressure cooker is disconnected from electricity, and the lid is rotated toward the open position. (Filing No. 91-2 at 56.) Dr. Pratt opined that if he can open the lid under these conditions, while the pressure cooker is pressurized, then the force required to open the lid is under 40 pounds, indicating the pressure cooker is defective. (Filing No. 91 at 3-4.) Dr. Pratt reported he was able to "easily" remove the pressure cooker's lid during the test, indicating a defect. (Filing No. 91 at 5.)

*Lid Safety Locking Mechanism Test*

The Lid Safety Locking Mechanism Test is "designed to isolate the amount of force necessary to defeat the float valve safety lock mechanism, one of the mechanisms designed to prevent the lid from opening under pressure." (Filing No. 91 at 4.) This test requires securing the base of the cooker to restrain it against rotation, attaching the lid to the pressure cooker in the normal manner and rotating it into the locked position, extending the float valve, and then

measuring the amount of force required to rotate the lid to the open position while the float valve is extended. (Filing No. 91-2 at 57). Dr. Pratt opined that if, during the test, the float valve safety lock could be defeated by less than approximately twenty pounds of force on the lid's periphery, "the lid will be easy to open under pressure sufficient to expel the heated contents." (Filing No. 91 at 4.) After testing, Dr. Pratt found that the pressure cooker's pressure lock was defeated by 4.79 pounds of tangential force on the lid's periphery. (Filing No. 91 at 5.)

Based on the fact testimony provided to Dr. Pratt and his testing and analysis, he concluded the pressure cooker was "unsafe and unreasonably dangerous at the time of the subject accident due to the defects" identified in his report. (Filing No. 91-2 at 35.) Dr. Pratt opined the "clogging of the exhaust pipe of the manual steam release valve" created the appearance that pressure had been released from the pressure cooker, even though the unit was still pressurized. (Filing 91-2 at 35.) In Dr. Pratt's opinion, this clog made it appear safe to remove the pressure cooker's lid, and the "almost totally ineffective floating valve lid locking mechanism failed to provide sufficient resistance to rotation of the lid, allowing it to be easily rotated by Ms. Clary to the open position while the cooker was pressurized to a level at which the contents would be expelled." (Filing No. 91-2 at 35.)

3.   **Clary's Response to Tristar's Request for Admission No. 15**

In Tristar's Request for Admissions No. 15, Ms. Clary originally admitted the following request: "Plaintiff waited until the float valve dropped, before attempting to remove the lid on July 17, 2020." (Filing No. 80-5.) Ms. Clary filed a declaration in December 2024 to state that she had not seen the float valve on that date, but she "waited until [she] believed the float valve had dropped before [she] attempted to remove the lid." (Filing No. 80-13.) Ms. Clary alleges she misunderstood the request, thinking the request asked whether she had waited until all the steam had exited the pressure cooker before attempting to open it. (Filing No. 80-14 at 12.) Ms. Clary clarified at her deposition that, at the time of responding to the request, she did not know where the float valve was on the pressure cooker. (Filing No. 80-14 at 13.) Only after learning where the float valve was, did she realize she could not have seen it the day of the accident. (Filing No. 80-14 at 13.)

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The movant bears the initial responsibility of informing the district court of the basis for its motion and must identify those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quotation omitted). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." Id. The Court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial. Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993).

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." Id. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. "In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit." Quinn v. St. Louis County, 653 F.3d 745, 751 (8th Cir. 2011) (quotation omitted). A mere scintilla of evidence to support the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the nonmovant." Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson, 643 F.3d at 1042 (quotation omitted).

## DISCUSSION

Tristar asserts three bases for summary judgment. First, Tristar argues that a valid arbitration agreement exists and should be enforced, precluding Ms. Clary's claim from being litigated in this Court. (Filing No. 77 at 3.) Second, Tristar argues that Dr. Pratt's testimony fails to meet the requirements for expert testimony under Rule 702 and should be excluded. According

to Tristar, without Dr. Pratt's testimony, Ms. Clary cannot succeed on her claim, warranting summary judgment. (Filing No. 77 at 1-2.) Third, Tristar argues that Plaintiff's admission to Defendant's Request for Admission No. 16 indicated that the pressure cooker was depressurized when she incurred her injuries, leaving no genuine factual dispute as to causation. (Filing No. 77 at 2-3.) For the reasons set forth below, the Court rejects these arguments and will deny Tristar's Motion for Summary Judgment.

I.     **Arbitration Agreement and Waiver**

Tristar asks this Court to compel arbitration pursuant to what it contends is a valid and enforceable arbitration agreement with Ms. Clary.[1] Regardless of whether there is sufficient evidence of a valid arbitration agreement between Tristar and Ms. Clary, this Court finds that Tristar waived its right to arbitration by failing to exercise its right to compel such arbitration earlier in the litigation process.

"[T]here is a strong presumption of arbitrability." *Affiliated Foods Midwest Coop., Inc. v. Integrated Distrib. Sols., LLC*, 460 F. Supp. 2d 1068, 1071-72 (D. Neb. 2006); *see also* 9 U.S.C. § 2. Where a valid arbitration agreement exists, courts should not deny a motion to compel "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* at 1071 (quoting *United Steelworkers of Am. V. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960)). "The party resisting arbitration bears the burden of demonstrating the motion to compel arbitration should be denied." *Id.* (citing *Green Tree Fin. Corp.-Ala. V. Randolph*, 531 U.S. 79, 92 (2000)).

Whether an enforceable arbitration agreement exists is a matter of state contract law. *Hollins v. Debt Relief of Am.*, 479 F. Supp. 2d. 1099, 1105 (D. Neb. 2007). Nebraska law favors the enforceability of arbitration agreements. Neb. Rev. Stat. § 25-2602.01. Under Nebraska law, enforceable contracts are supported by an offer, acceptance, a meeting of the minds, and mutuality of obligation. *Acklie v. Greater Omaha Packing Co., Inc.*, 306 Neb. 108, 118-19, 944 N.W.2d 297, 306 (2020).

---

[1] Although Tristar moved for summary judgment under Rule 56, motions to compel arbitration are "properly analyzed under either Rule 12(b)(6) or Rule 56[,]" and "legal authority does not forbid parties from using Rules 12(b)(6) or 56 to enforce an arbitration agreement." *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017).

8

However, "[a]rbitration is a waivable contractual right." *McCoy v. Walmart, Inc.*, 13 F.4th 702, 703 (8th Cir. 2021), *abrogated on other grounds by*, *In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th 610 (8th Cir. 2024). The Eighth Circuit follows a two-part test to determine whether a party has waived its right to arbitration. The Court must first determine whether the party knew of its existing right to arbitration, and then whether the party acted "inconsistently with" that right. *In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th at 614.[2] A party can act inconsistently with the right to arbitrate by "substantially invok[ing] the litigation machinery rather than promptly seek[ing] arbitration." *Id.* (citing *McCoy*, 13 F.4th at 704). A party "substantially invokes" the litigation machinery when it "engages in extensive discovery" or "fails to move to compel arbitration and stay litigation in a timely manner." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1087 (8th Cir. 2021) (quotations removed).

Tristar waived its right to compel arbitration by failing to promptly seek arbitration and instead engaging in extensive discovery, despite knowing of its right to arbitration. Tristar knew of its right to arbitration prior to this joint motion for summary judgment and motion to compel. This lawsuit commenced on October 18, 2022, when Ms. Clary filed her complaint and named Tristar as a defendant. (Filing No. 1.) On January 20, 2023, Tristar filed its answer to the complaint and asserted right to arbitration as an affirmative defense, indicating Tristar at least knew that it "may" have had a right to compel arbitration as of that date. (Filing No. 18 at 11.) Tristar filed the present motion on May 28, 2025, over two years later. (Filing No. 75.) During those two years, Tristar has deposed Ms. Clary twice (Filing No. 80-4; Filing No. 80-14), served written discovery requests (Filing No. 35), responded to written discovery (Filing No. 36; Filing No. 47), identified expert witnesses (Filing No. 62), deposed Plaintiff's expert witness (Filing No. 80-9), and engaged in motions practice (Filing No. 44; Filing No. 48; Filing No. 53; Filing No. 65).

Tristar contends, however, that this extensive discovery was necessary for it to ascertain the existence of its arbitration right. Tristar argues that at the time of receiving the complaint, it

---

[2] After *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), prejudice to the other party is no longer a factor considered in the Eighth Circuit's determination of whether a right to arbitration has been waived. However, the first two prongs of the arbitration waiver test remain (knowledge of existence and inconsistent acts), which focus on "'the actions of the person who held the right,' not 'the effects of those actions on the opposing party.'" *In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th at 614 (quoting *Morgan*, 596 U.S. at 417). The question of waiver now "boils down to whether a party has 'intentional[ly] relinquish[ed] or abandon[ed] . . . a known right.'" *Id.* (quoting *Morgan*, 596 U.S. at 417) (alterations in original).

had insufficient information to determine whether Ms. Clary received the arbitration agreement, giving them a right to arbitration. (Filing No. 99 at 13-15.) Tristar asserts that it lacked sufficient evidence to establish its arbitration right until Ms. Clary's deposition on September 10, 2024, when she confirmed she had received the Tristar Arbitration Agreement. (Filing No. 99 at 13-14.) But then, according to Tristar, Ms. Clary's deposition testimony further stalled its ability to establish its arbitration right because Ms. Clary also testified she did not purchase the pressure cooker. (Filing No. 99 at 14; Filing No. 80-4 at 4.) Because of this unexpected twist in the facts, Tristar supposedly had to wait even longer to determine whether it had a right to arbitrate and wait for Ms. Clary to amend her complaint to reflect that she did not purchase the pressure cooker. (Filing No. 99 at 14-15.) But Ms. Clary never amended the complaint. Only after November 27, 2024, after Ms. Clary failed to amend her complaint by the deadline, did Tristar have sufficient information to ascertain the existence of its right to arbitrate, despite reserving the right earlier when it filed its answer on January 20, 2023. (Filing No. 18.) Then, six months later, Tristar filed its motion to compel arbitration along with its motion for summary judgment on May 28, 2025. (Filing No. 75.)

The Court disagrees that this extensive discovery was necessary for Tristar to determine its arbitration right. First, Tristar likely would have had sufficient evidence to compel arbitration, or at least move to compel, at the time of the complaint. Second, even if Tristar had to secure additional evidence to compel arbitration, the extensive discovery engaged in here was not necessary to fulfill the evidentiary burden to compel arbitration.

Based on the complaint and the information in Tristar's possession at the time of the complaint, Tristar had sufficient information to move to compel arbitration. Tristar uses a standardized arbitration agreement for its products. (Filing No. 80-15.) The Tristar Arbitration Agreement (Filing No. 80-15) provides that a consumer consents to the agreement by purchasing a Tristar product. (Filing No. 80-15.) While consumers may opt out of the agreement, they may do so only by contacting Tristar within thirty days of product delivery. (Filing No. 80-15.)

The complaint alleges Ms. Clary purchased the cooker from Walmart, a retail distributor. (Filing No. 1). As the distributor of the pressure cooker at issue, Tristar would have had information in its possession at the time of the complaint as to whether the standard packaging for the pressure cooker included the Tristar Arbitration Agreement. Further, Tristar's inclusion of an arbitration

10

right in its answer indicates that Tristar believed the product came with some standardized arbitration agreement. Since consumers may only opt out of the agreement by contacting Tristar, Tristar also would have ~~also~~ possessed any communications from Ms. Clary to Tristar requesting to opt out of the agreement.

Therefore, after the complaint was filed, Tristar likely had sufficient evidence to establish an arbitration agreement by establishing the existence of an offer (the Tristar Arbitration Agreement), acceptance (Ms. Clary's purchase of the cooker), mutual assent (presumed receipt of the agreement with the product after purchase without any subsequent opt-out request), and mutuality of obligation (set forth in the Tristar Arbitration Agreement's terms). If Tristar had moved to compel, Ms. Clary would have born the burden to dispel these elements (e.g., by asserting that she had not received the agreement with the purchase, or she had not purchased the pressure cooker). But Tristar did not move to compel at that time. Instead, Tristar filed its answer, reserving a right to arbitrate as an affirmative defense, and engaged in litigation and discovery for two years.

Even accepting Tristar's contention that it had to use the discovery process to acquire additional evidence to support its motion to compel, Tristar did not need to engage in such extensive discovery to do so. Tristar had an opportunity to confirm Ms. Clary's receipt of the Tristar Arbitration Agreement in its first set of written discovery requests sent September 18, 2023. ([Filing No. 35](#).) Whether or not Tristar used this opportunity to confirm its arbitration right is not in the record before the Court. However, it hardly appears necessary that Tristar had to further engage in the discovery process, even deposing Ms. Clary twice, to finally determine it had a right to arbitration. Further, if Tristar had been proactive in pursuing its arbitration right, Ms. Clary's deposition might not have revealed the additional issues with determining whether Ms. Clary had purchased the pressure cooker, "requiring" Tristar to further wait until Ms. Clary failed to amend her complaint to establish she had indeed purchased the pressure cooker, as originally alleged in the complaint.

In short, Tristar has waited over two years to assert its right to arbitration, despite reserving this right in its first pleading in this case. During this time, Tristar substantially invoked the federal litigation machinery by engaging in extensive discovery. The Court therefore finds

that Tristar has waived its right to arbitration and declines to compel arbitration or grant summary judgment on this ground.

## II. Admissibility of Dr. Pratt's Testimony

Tristar contends that Dr. Pratt's expert opinion is inadmissible because (1) it was unreliable because he did not use "the scientific method" in his testing, and (2) his opinion is irrelevant because the tests Dr. Pratt relies upon did not attempt to recreate the pressure cooker explosion. Each of these arguments will be addressed in turn.

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony and give the Court a gatekeeping responsibility to ensure that all expert evidence is relevant and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Sprafka v. Med. Device Bus. Servs., Inc.*, 139 F.4th 656, 660-61 (8th Cir. 2025). Rule 702 was amended in 2023 "'to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.'" Sprafka, 139 F.4th at 660 (quoting Fed. R. Evid. 702, Advisory Committee's Note to 2023 Amendment). After that amendment, "courts continue to have a gatekeeping role to assure that evidence admitted in a case is both relevant and reliable." *Id.* (quoting *Academy Bank, N.A. v. AmGuard Ins. Co*., 116 F.4th 768, 790 (8th Cir. 2024)).

"As the gatekeeper, the district court's role is to discern expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Id.* (quoting *Ackerman v. U-Park, Inc*., 951 F.3d 929, 933 (8th Cir. 2020)). Rule 702 requires the proponent of expert testimony to demonstrate to the court that "it is more likely than not" that (1) the expert's knowledge will "help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Reliability of an expert opinion involves consideration of "(1) whether the expert's theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error of the theory or technique, and

(4) whether the technique or theory is generally accepted." *Academy Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 790 (8th Cir. 2024); *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021). Expert opinions "must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702, Advisory Committee's Note to 2023 Amendment.

Other considerations recognized since *Daubert* include "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Id.* (quotation omitted). These factors are not "exhaustive or limiting." *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009). Nor do courts need to consider each factor in each case; factors should only be relied upon to the extent that they are relevant. *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007). Ultimately, courts must evaluate the reliability of expert testimony based on the facts of the case before them. *Presley*, 553 F.3d at 643. The Court has "'considerable leeway'" in determining whether "'particular expert testimony is reliable.'" *Academy Bank, N.A.*, 116 F.4th 768, 791 (8th Cir. 2024).

### A. Reliability and Scientific Method

Tristar asserts that scientific testimony must use "the scientific method" to be reliable and thereby admissible, and Dr. Pratt admittedly did not use "the scientific method." (Filing No. 77 at 9; Filing No. 79 at 8.) Instead of the scientific method, Dr. Pratt states he used the "Forensic Engineering Method," which does not require the use of a hypothesis like the scientific method. (Filing No. 91 at 6.)

Rule 702 enables experts to testify to "scientific knowledge." Fed. R. Evid. 702. Although the U.S. Supreme Court in *Daubert* stated, "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method[,]" the Supreme Court also elaborated that "[p]roposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993); *see also id.* at 589-90 (Scientific knowledge implies "a grounding in the methods and procedures of science."). The requirement of "scientific knowledge" reflects the standard for evidentiary reliability, which is "based upon *scientific validity*." *Id.* at 590, n.9 (emphasis in original). If scientific testimony rests on "good grounds[,]" then it should be tested by the

13

adversarial process rather than excluded by the court at the outset. *Johnson v. Mead Johnson & Co, LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

Tristar contends Dr. Pratt failed to use "the scientific method." (Filing No. 77 at 9.) Instead, Dr. Pratt determined the pressure cooker was defective by visually inspecting its steam valve before testing it, which Tristar argues is "antithetical to the scientific method." (Filing No. 77 at 9.) Tristar cites *Claar v. Burlington Northern Railroad Co.* as legal authority that Dr. Pratt's testimony is categorically unreliable because Dr. Pratt made a conclusion prior to conducting testing. 29 F.3d 499 (9th Cir. 1994). *Claar* does not categorically bar experts from forming conclusions prior to testing. Instead, *Claar* indicates that scientific experts may form conclusions prior to conducting tests, but an expert's conviction in an initial conclusion cannot be so firm as to become unobjective. *Id.* at 503.

In *Claar*, the Court upheld the trial court's exclusion of expert testimony where the experts had "formed their opinions before reading the relevant literature, even though they admitted that they were not sufficiently familiar with the field to diagnose the causes of plaintiffs' injuries without first reviewing that literature." *Id.* at 502. The Court reasoned that forming a "firm conclusion" and then researching literature to support that conclusion was "the antithesis" of the scientific method. *Id.* at 502-03. The Court acknowledged that experts "may form initial tentative hypotheses[,]" but expert testimony may lack "the objectivity that is the hallmark of the scientific method[]" when an expert's conviction in their conclusion is "so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests." *Id.* at 503.

The expert testimony excluded in *Claar* is unlike Dr. Pratt's testimony. First, unlike the experts in *Claar*, who were insufficiently familiar with the field to which they testified, Dr. Pratt holds extensive experience and specialized knowledge with pressure cooker defects. Dr. Pratt has a Ph.D. in Civil Engineering and over 55 years in developing "permanent and temporary fasteners, mechanisms, and related tooling and equipment, for the aerospace, industrial and sporting goods markets[.]" (Filing No. 91-2 at 3.) He has tested over 150 pressure cookers in other litigation. (Filing No. 91 at 2.) Second, Dr. Pratt did not solely rely upon his initial visual inspection that the steam release valve appeared clogged to conclude the pressure cooker was defective. Dr. Pratt conducted two additional tests which he opines establish that the pressure cooker can be opened under pressure. Together, the tests and visual inspection form his conclusion that (1) the steam

14

valve was clogged and likely failed to continue venting steam shortly before the accident, giving the appearance that the pressure cooker was safe to open, and (2) Ms. Clary was then able to easily open the pressure cooker while it was pressurized due to failures in the pressure cooker's locking mechanisms. (Filing No. 91-2 at 35.) Thus, the proposition in *Claar* does not categorically bar Dr. Pratt's testimony. This Court otherwise declines to exclude Dr. Pratt's testimony on the basis that he did not use "the scientific method."[3]

This Court further finds that Dr. Pratt's methodology and testimony is sufficiently reliable. The Forensic Engineering Method relies on accepted engineering principles, has been subjected to peer review, and is accepted by the forensic engineering community. (Filing No. 91-3; Filing No. 91 at 6-7.) Dr. Pratt's opinion relies on this methodology, and he has provided the principles he relied upon in formulating and conducting his tests and enunciated the factual bases for his opinions. (Filing No. 91, Filing No. 91-2.) These tests are capable of being replicated and tested. Dr. Pratt has provided the test protocol and conducted the same tests on "dozens of other electric pressure cookers[,]" including in joint testing with the opposing expert witness in this litigation, as well as in other litigation. (Filing No. 91-2; Filing No. 96-1 at 3-4.) Dr. Pratt has also tested over 50 other pressure cookers to similarly determine whether they could be opened under pressure for purposes unrelated to litigation. (Filing No. 91 at 2.) Therefore, this Court is satisfied that the *Daubert* factors weigh in favor of Dr. Pratt's testing, and the evidence establishes that it is "more likely than not" that Dr. Pratt's testing is reliable. Fed. R. Evid. 702.

Because these tests are sufficiently reliable under the *Daubert* factors, the Court also rejects Tristar's contention that Dr. Pratt's opinion testimony is inadmissible due to relying upon these tests. As such, this Court does not find any issue as to the reliability of Dr. Pratt's testimony that

---

[3] To the extent that Defendants argue that Dr. Pratt was required to use "the scientific method" to satisfy *Daubert*, Tristar has not defined "the scientific method," and the Court is not inclined to narrowly define "the scientific method" to exclude accepted scientific methodologies. The Forensic Engineering Method is a scientific methodology that has been deemed reliable by other courts, even if Dr. Pratt states that it is different than "the 'classical' scientific method." *See Trask v. Olin Corp.*, No. 12-340, 2016 WL 1181428, at *3, 10 (W.D. Pa. Mar. 28, 2016) (finding expert testimony reliable where expert reached conclusions "applying traditional forensic engineering methods[]"); *Shockman v. State Farm Lloyds*, No. 4:22-CV-02030, 2025 WL 1305355, at *2 (S.D. Tex. Mar. 31, 2025) (holding an expert "employed a reliable approach consistent with practices in the field of forensic engineering by inspecting the property, analyzing weather data from multiple sources, documenting damage, and applying his professional experience to reach his conclusions"); *see also Williams v. Tristar Prods., Inc.*, 418 F. Supp. 3d 1212, 1222 (M.D. Ga. 2018) (finding "based on Dr. Pratt's knowledge and experience, his proposed testimony and methodology is sufficiently reliable"); *Heath v. Tristar Prods., Inc.*, 2:17-CV-2869-GMN-BNW, 2019 WL 4738005, at *6 (D. Nev. Sep. 27, 2019) (similarly finding Dr. Pratt's testimony on a pressure cooker design defect to be based on "reliable methodology and sufficient data").

could not be addressed by the adversarial process rather than by exclusion of the evidence at the outset.

### B.     Relevance of Testing

Tristar also contends that Dr. Pratt's testing is irrelevant because it does not attempt to replicate Ms. Clary's accident. Tristar has made this argument regarding Dr. Pratt's expert testimony before, and the court rejected the argument. *See Heath v. Tristar Prods., Inc.*, 2-17-CV-2869-GMN-BNW, 2019 WL 4738004 (D. Nev. Sep. 27, 2019). This Court, too, will reject the argument that an expert testing must replicate litigated events to be admissible.

Rule 702 requires that admissible expert testimony assist "the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. This condition relates to relevance, requiring trial courts to assess whether the reasoning or methodology underlying proffered scientific testimony "can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "The consideration has been aptly described . . . as one of 'fit.'" *Id.* at 591. Whether expert testimony sufficiently fits the facts of the case is not always obvious; testing that may be scientifically valid for one purpose may not be valid for another purpose. *Id.*

But Rule 702 and *Daubert* do not require that scientific testing underlying expert testimony replicate alleged events for testimony to be admissible. *See* Fed. R. Evid. 702, *Daubert*, 509 U.S. 579. Nor does Tristar provide any legal authority to support this restrictive reading. (Filing No. 95; Filing No. 79.) Rather, expert testimony should have a sufficient nexus to the facts of the case to "aid the jury in resolving the factual dispute." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001).

There is a sufficient nexus between Dr. Pratt's testimony and the facts of this case. Both the Lid Removal Under Pressure Test and Lid Safety Locking Mechanism Test tested the pressure cooker's safety mechanism's efficacy while the unit was pressurized. (Filing No. 91-2 at 24). Essential to Ms. Clary's claim is that the pressure cooker's safety mechanisms failed, allowing the pot to open while pressurized, which caused her injuries. (Filing No. 1.) Therefore, Dr. Pratt's testing on whether the pressure cooker could be opened under pressure with safety mechanisms in place is helpful to a jury in resolving the factual issues as to whether (1) Ms. Clary could open the

lid easily (2) while the pressure cooker was pressurized to a level sufficient to cause her injuries. Because these tests are sufficiently relevant to the facts of the case, the Court also rejects Tristar's contention that Dr. Pratt's opinion testimony is inadmissible due to relying upon these tests.

Accordingly, this Court declines to grant summary judgment on the grounds that Dr. Pratt's testimony is inadmissible, and Ms. Clary lacks admissible evidence to prove a product defect caused her injuries.[4]

### III. Request for Admission No. 16

Tristar argues that Ms. Clary's admission that the float valve had "dropped" before she opened the pressure cooker is a judicial admission that dispels any genuine factual dispute that a defect in the pressure cooker injured Ms. Clary. (Filing No. 77 at 2-3.)

Judicial admissions must be "deliberate, clear, and unambiguous." *Grandoe Corp v. Gander Mountain Co.*, 761 F.3d 876, 885 (8th Cir. 2014) (quoting *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 625 (8th Cir. 2014)) (internal quotation marks omitted). Courts will "generally reject efforts to convert 'carelessly worded' stipulations into dispositive admissions." *Acciona Windpower N. Am., LLC v. City of West Branch, Iowa*, 847 F.3d 963, 968 (8th Cir. 2017). Courts may consider the context of the stipulation when determining whether such a concession is dispositive. *Grandoe Corp.*, 761 F.3d at 885 (rejecting defendant's interpretation of an admission as dispositive where "such a concession would have been senseless," immediately defeating the admitting party's entire case).

Here, Ms. Clary did not deliberately, clearly, and unambiguously admit that the pressure cooker was depressurized, as Tristar contends. Ms. Clary admitted that the float valve was in the reverted position, but she did not clearly or unambiguously admit the pressure cooker was depressurized. (Filing No. 80-5 at 3.) She did not even deliberately admit the float valve's position because she later revealed she did not know what a float valve was. (Filing No. 80-14 at 13.) Ms. Clary maintained in her complaint and other discovery responses that the pressure cooker was pressurized, causing the explosion. (Filing No. 1; Filing No. 80-3 at 1; Filing No. 80-4 at 10; Filing No. 80-14 at 12.)

---

[4] The Court likewise denies Tristar's Motion to Exclude the Opinions of Dr. John Pratt (Filing No. 78).

In other words, Ms. Clary had a "carelessly worded" stipulation and later attempted to correct her erroneous response after discovering this misunderstanding. (*See* Filing No. 80-13.) It would be senseless for Ms. Clary to concede the unit was not pressurized in a single admission, given that her entire claim is the pressure cooker had a defect that enabled her to open it while it was pressurized, causing her injury. (*See* Filing No. 1.) Given the ambiguity of the admission and its context, this Court declines to interpret Ms. Clary's response to Request for Admission No. 16 as a judicial admission that the pressure cooker was not pressurized. Therefore, a genuine issue of material fact remains as to whether the pressure cooker was pressurized, making summary judgment inappropriate on this ground.

As genuine issues of material fact remain to be resolved at trial, summary judgment is inappropriate. Accordingly,

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Filing No. 75) is denied.

2. Defendant's Motion to Exclude (Filing No. 78) is denied.

Dated this 17th day of October, 2025.

BY THE COURT:

Susan M. Bazis
United States District Judge